RYAN ADAIR SHANNON (OR Bar No. 155537)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 11374
Portland, OR 97211
Tel: 971-717-6407
rshannon@biologicaldiversity.org

*Lead Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

Portland Division

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; CASCADIA WILDLANDS; OREGON WILD; and AUDUBON SOCIETY OF PORTLAND, | Civil Action No.: |
| *Plaintiffs*, | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| v. | |
| U.S. FISH AND WILDLIFE SERVICE; MARTHA WILLIAMS, in her official capacity as acting Director of the U.S. Fish and Wildlife Service; and SECRETARY, U.S. DEPARTMENT OF THE INTERIOR, | |
| *Defendants*. | |

## INTRODUCTION

1.     The red tree vole (*Arborimus longicaudus*) is an arboreal mammal that rarely visits the ground and uniquely subsists on a diet of conifer needles. The north Oregon coast red tree vole population ("tree vole") is in imminent danger of extinction due to extensive historic and ongoing loss of habitat from logging and wildfire. The tree vole has already disappeared from large portions of its range, continues to lose habitat to logging, and faces other ongoing threats. Critically, the tree vole receives little-to-no conservation or protection on the state and private lands that make up most of its range.

2.     Based on the severity of threats and the tree vole's precarious status, in 2011, the U.S. Fish and Wildlife Service ("Service") determined that the species should be listed as "endangered" or "threatened" under the Endangered Species Act ("ESA" or "Act"). 76 Fed. Reg. 63,720, 63,753–56 (Oct. 13, 2011). Rather than list the tree vole, however, the Service determined listing at that time was "precluded" by other, purportedly higher-priority listing activities, and on that basis, designated the tree vole as a "candidate" species. A candidate species is one that qualifies for protection as an endangered or threatened species, yet receives no protection while it waits—often for years—for the Service to promulgate a regulation listing the species as endangered or threatened. The Service subsequently reaffirmed the need for listing the tree vole, reconfirming its status as a candidate species, on six occasions—most recently, on October 10, 2019. 84 Fed. Reg. 54,732, 54,751.

3.     Just two months later, however, the Service abruptly reversed course and found the tree vole does not warrant protection as an endangered or threatened species. Endangered and Threatened Wildlife and Plants; Five Species Not Warranted for Listing as Endangered or Threatened Species, 84 Fed. Reg. 69,707, 69,709–10 (Dec. 19, 2019) ("not-warranted finding").

With this reversal, the Service dropped the tree vole from the agency's list of candidate species awaiting protection.

4.      Despite repeatedly—and correctly—finding that the tree vole has been eliminated from most of its historic range due to the logging of its old-growth habitat and wildfire, the Service inexplicably concluded that the tree vole is not at risk of extinction on the thin rationale that the species manages to persist in two small clusters of federal public land. In so doing, the Service ignored its own prior findings that wildfire poses an existential threat to this species, a threat that is now being exacerbated by climate change. The Service also ignored its prior findings that habitat loss due to logging is ongoing and that adequate regulatory mechanisms are lacking on state and private lands that are the majority of the tree vole's remaining range.

5.      Compounding these errors, the Service failed to consider whether state and private lands, where the tree vole is unquestionably at risk of extinction, comprise a "significant portion of its range," which would provide another basis for listing the species as endangered or threatened. 16 U.S.C. §§ 1532(6), (20), 1533(a)(1). Had the Service conducted such an analysis, there can be no doubt the tree vole would have been found to warrant listing as threatened or endangered.

6.      For these and additional reasons, the Service's not-warranted finding fails to follow the best available science as the ESA requires, violates other ESA provisions, and is arbitrary and capricious in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) ("APA"). To remedy these violations, the Center seeks an order vacating the Service's not-warranted finding and remanding the matter to the Service to issue a new determination regarding whether the tree vole warrants protection under the ESA as an endangered or threatened species by a date certain.

## JURISDICTION AND VENUE

7.      This action is brought pursuant to the ESA, 16 U.S.C. § 1540(g)(1)(C), which

waives the Defendants' sovereign immunity. This Court has jurisdiction over this action under

16 U.S.C § 1540(c), (g) (ESA), 28 U.S.C. § 2201 (declaratory judgment), 28 U.S.C. § 1331

(federal question).

8.      Venue in this Court is proper under 28 U.S.C. § 1391(e) and 16 U.S.C. §

1540(g)(3)(A) because Defendants are officers and employees of the United States acting in their

official capacity, and a substantial part of the violations giving rise to the claim occurred in this

judicial district. Venue is proper in the Division according to Local Rule 3-2 because a

substantial part of the events giving rise to the claim occurred in this Division. The Service's

Oregon Fish and Wildlife Office in Portland, Oregon prepared the not-warranted finding for the

tree vole. Plaintiffs Center for Biological Diversity, Oregon Wild, and the Audubon Society of

Portland also maintain offices in Portland, Oregon.

9.      Plaintiffs provided Defendants with 60 days' written notice of their intent to sue

on April 14, 2020, and supplemented that notice on July 13, 2020, as required by 16 U.S.C. §

1540(g)(2)(C).

## PARTIES

10.      Plaintiff Center for Biological Diversity (the "Center") is a national, non-profit

conservation organization that works through science, law, and the media to protect imperiled

species and their habitats. The Center has more than 84,000 members, including many who live

and recreate in the tree vole's historic range. Plaintiff is incorporated in California and

headquartered in Tucson, Arizona, with offices throughout the United States including in

Portland, Oregon. The Center brings this action on behalf of itself and its members.

11.     Center members and staff are concerned with the conservation of imperiled species, including the tree vole, and the effective implementation of the ESA to protect those species. Center members and staff have aesthetic, scientific, recreational, spiritual, and other interests in the tree vole and its habitat. The Center has members who are interested in the species, who spend time in the tree vole's habitat on an ongoing basis and have concrete plans to visit the tree vole's habitat in the future, and who will attempt to observe them in the wild.

12.     Plaintiff Cascadia Wildlands is a local grassroots conservation organization that works to defend and restore Cascadia's wild ecosystems for everyone. Cascadia Wildlands is headquartered in Eugene, Oregon and has offices in Oregon and Alaska. Focused on engaging the community in protecting the Cascadia bioregion, Cascadia Wildlands staff members organize hikes in tree vole habitat and engage in tree vole surveys throughout the region. Cascadia Wildlands staff and members have ongoing scientific and recreational interest in the species and its habitat and have concrete plans to visit the tree vole's habitat in the future.

13.     Plaintiff Oregon Wild is a nonprofit conservation organization that works to protect Oregon's wildlands, wildlife, and waters as an enduring legacy for future generations. Oregon Wild's main office is located in Portland, Oregon with additional field offices in Eugene, Bend, and Enterprise.

14.     Oregon Wild has a long history of advocating for the protection of the state's ancient forests, public lands, rivers and streams, native wildlife and the habitat they call home. Oregon Wild's members, staff, and supporters enjoy the aesthetic, scientific, recreational, spiritual, ecological, and other values of the forests that support the imperiled tree vole. They are also concerned with the effective and transparent implementation of the ESA to safeguard vulnerable species and critical habitat such as the tree vole.

15.    Plaintiff Audubon Society of Portland ("Audubon") is a statewide non-profit conservation organization with over 17,000 members and a mission to inspire all people to love and protect birds, wildlife, and the natural environment on which all life depends. Audubon manages forest sanctuaries on the Oregon coast, Mt. Hood, and in Portland, Oregon. Protecting Oregon's forests and imperiled forest species including the tree vole has long been a priority for Audubon. Audubon's staff and members actively recreate in and advocate for protection of the forests that support the tree vole.

16.    Plaintiffs' members' aesthetic, scientific, recreational, spiritual, and other legally protected interests in the tree vole are irreparably harmed by Defendants' actions unless the relief sought in this complaint is granted.

17.    Defendant U.S. Fish and Wildlife Service is a federal agency within the Department of the Interior. The Secretary of the Interior has delegated to the Service the authority to administer the ESA for non-marine species. 50 C.F.R. § 402.01(b). This authority encompasses proposed and final listing determinations for the tree vole.

18.    Defendant Martha Williams is the the acting Director of the U.S Fish and Wildlife Service and is charged with ensuring agency decisions comply with the law. Plaintiffs sue Defendant Williams in her official capacity.

19.    Defendant Secretary of the Interior ("Secretary") has the ultimate responsibility to administer and implement the provisions of the ESA regarding the tree vole, and to comply with all other federal laws applicable to the U.S. Department of the Interior. Plaintiffs sue Defendant Secretary in their official capacity.

## STATUTORY AND REGULATORY BACKGROUND

### Endangered Species Act

20.     The Supreme Court has stated that the ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). Its purpose is to provide "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved," and "a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).

*ESA Listing and Protections*

21.     The ESA directs the Service to add species it determines are endangered or threatened to a list of endangered and threatened species, a process known as "listing." *Id*. § 1533(a); 50 C.F.R. § 17.11 (lists of endangered and threatened wildlife).

22.     A species is "endangered" when it "is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A species is "threatened" when it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

23.     The ESA does not define what constitutes a "significant portion" of a species' range. In 2014, the Service and the National Marine Fisheries Service promulgated a "Final Policy on Interpretation of the Phrase 'Significant Portion of Its Range' in the ESA's Definitions of 'Endangered Species' and "Threatened Species.'" 79 Fed. Reg. 37,578 (July 1, 2014) ("SPR Policy"). The SPR Policy provides that "a key part" of the Service's analysis of whether a species is at risk in a significant portion of its range is "whether the threats are geographically concentrated in some way." *Id.* at 37,586.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                              7

24.     The ESA does not define "foreseeable future." *See generally id.* § 1532. The Service interprets the "foreseeable future" to "extend[] only so far into the future as the Services can reasonably determine that both the future threats and the species' responses to those threats are likely." 50 C.F.R. § 424.11(d). The Service determines "the foreseeable future on a case-by-case basis, using the best available data and taking into account considerations such as the species' life-history characteristics, threat-projection timeframes, and environmental variability." *Id.*

25.     A "species" is defined by the Act to include "any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16).

26.     The ESA does not define "distinct population segment" ("DPS"), but in 1996 the Service and the National Marine Fisheries Service published the "Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act," 61 Fed. Reg. 4,722 (Feb. 7, 1996), to adopt an interpretation of the phrase "distinct population segment." When considering whether a population segment qualifies as a DPS under the Act, the policy requires the Service to determine whether a population segment is "discrete" and "significant." A population is "discrete" if it is markedly separated from other populations of the same taxon due to physical, physiological, ecological, or behavioral factors. Whether a population is "significant" is based on whether: it persists in an ecological setting that is unusual or unique for the species; loss of the population would result in a significant gap in the range of the species; the population represents the only surviving natural occurrence of a species that may be more abundant elsewhere as an introduced population outside its historical range; or it differs markedly from other populations of the species in its genetic characteristics. If the Service determines that a population segment is both discrete and significant, then the population

segment qualifies as a DPS and meets the ESA's definition of a "species" that may be classified as "endangered" or "threatened."

27.    The Service must list a species, including a DPS, as endangered or threatened based on threats throughout all or in a "significant portion" of the DPS' range. The question of whether a species is endangered or threatened "throughout all" of its range is distinct from the question of whether a species is endangered or threatened in a "significant portion of its range."

28.    In making listing determinations, the Service must assess threats to the species based on five statutory factors, also known as the ESA's "listing factors." 16 U.S.C. § 1533(a)(1). Those factors are: (A) the present or threatened destruction, modification, or curtailment of the species' habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence. *Id*.

29.    The Service must list a species if the species meets the definition of "endangered" or "threatened" due to "any one or a combination of" these five listing factors. 50 C.F.R. § 424.11(c); *see* 16 U.S.C. § 1533(a)(1). When most of a species' historic range has been lost and threats to all or a "significant portion" of its current range are ongoing, the Service must explain why the species should not be protected as a listed species.

30.    The Service must make listing determinations "solely on the basis of the best scientific and commercial data available," 16 U.S.C. § 1533(b)(1)(A), and may not allow for "economic considerations" when making "determinations regarding the status of species." H.R. Rep. No. 97-835, at 20 (1982).

31.     The requirement that the Service base listing determinations "solely" on the "best scientific and commercial data available," 16 U.S.C. § 1533(b)(1)(A), means that the Service cannot invoke scientific uncertainty to justify its refusal to list a species as "endangered" or "threatened." It means that the Service must consider the available data, even if that information does not provide clarity or absolute certainty.

32.     A species does not receive any protections under the ESA until it is listed as endangered or threatened. Without these protections, endangered and threatened species continue to decline toward extinction and become more difficult to protect from the extinction threat as their situations become dire.

33.     Once listed, species are afforded numerous substantive protections. For example, ESA Section 4 requires the Service to designate areas that are "essential to the conservation of the species" as "critical habitat," and to develop and implement recovery plans. *Id*. §§ 1533(a)(3), (f); 1532(5). Section 7(a)(2) requires all federal agencies to consult with the Service to ensure their actions are not "likely to jeopardize the continued existence" of listed species or "result in the destruction or adverse modification" of their critical habitat. *Id.* § 1536(a)(2). Section 9(a)(1)(B) makes it unlawful to "take" any endangered species, which means no person can "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" an endangered species without first receiving authorization from the Service. *Id.* §§ 1532(19), 1538. Thus, listing is the crucial first step in the ESA's system of species conservation and recovery.

*ESA Listing Petitions*

34.     The ESA allows an interested person to formally petition the Service to list a species as endangered or threatened. *Id.* § 1533(b)(3)(A); 50 C.F.R. § 424.14(a).

35.     Upon receiving a listing petition, the Service generally has 90 days to determine whether the petition "presents substantial scientific or commercial information indicating that the potential action may be warranted." 16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(h)(1). This is known as a "90-day finding."

36.     If the Service makes a positive 90-day finding in response to a listing petition, it must conduct a "status review" of the species. 16 U.S.C. § 1533(b)(1)(A); 50 C.F.R. § 424.14(h)(2).

37.     Within 12 months of receiving a listing petition that receives a positive 90-day finding, and based on the status review, the Service must make one of three "12-month findings": (1) the petitioned actions is "warranted"; (2) the petitioned action is "not warranted"; or (3) the petitioned action is warranted, but listing is presently "precluded" by other proposals to list, delist, or reclassify the status of listed species. 16 U.S.C. § 1533(b)(3)(B)(i)-(iii).

38.     If the Service issues a 12-month finding that listing the species is "warranted," it must promptly publish in the Federal Register a listing determination, i.e., the 12-month finding and a "general notice and the complete text of a proposed regulation" to list the species as endangered or threatened. *Id.* § 1533(b)(3)(B)(ii). Within one year of publishing a "warranted" finding and propoposed rule, the Service must publish the final regulation listing the species.

39.     If the Service issues a 12-month finding that listing the species is "not warranted," that determination must be published in the Federal Register and is subject judicial review. *Id.* § 1533(b)(3)(C)(ii).

40.     If the Service issues a "warranted-but-precluded" 12-month finding, that finding also must be published in the Federal Register and is subject to judicial review. *Id.* A species that receives a "warranted-but-precluded" 12-month finding is classified as a "candidate" species and

given a "listing priority number," *see* Endangered Species Listing and Recovery Priority Guidelines, 48 Fed. Reg. 43,098, 43,102–05 (Sept. 21, 1983), and the Service must reassess the status of such candidate species annually. 16 U.S.C. §1533(b)(3)(C)(i); 50 C.F.R. § 424.14(h)(3).

41.     To support a warranted-but-precluded determination, the Service must show that "the immediate proposal and timely promulgation of a final regulation" adding the species to the list of endangered or threatened species is *both* "precluded by pending proposals to determine whether any species is an endangered species or a threatened species" *and* that "expeditious progress is being made" to complete listing activities of a higher priority. 16 U.S.C. § 1533(b)(3)(B)(iii) (emphasis added). Since a "warranted-but-precluded" finding delays protection for the endangered (or threatened) species, it is appropriate only under "limited conditions" and may not be used to justify "the foot-dragging efforts of a delinquent agency." H. Rep. No. 97-835, at 22 (1982) (Conf. Rep.), *as reprinted in* 1982 U.S.C.C.A.N. 2860, 2863.

### Administrative Procedure Act

42.     Under the APA, a reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The APA supplies the standard of judicial review of the not-warranted finding at issue here.

43.     An agency action is "arbitrary and capricious" and must be "set aside," *id.*, when it relies on factors which Congress did not intend for it to consider, fails to consider an important aspect of the problem, or offers an explanation for its decision that is counter to the evidence before the agency.

44.     An agency action is also "arbitrary and capricious" when an agency changes its position from a prior position yet fails to supply a reasoned explanation, or when the agency rests

on new factual findings that differ from prior factual findings without providing a detailed justification for its change in position.

## FACTUAL BACKGROUND

### The Red Tree Vole

45.     The red tree vole (*Arborimus longicaudus*) is a small arboreal rodent that spends most of its life in the canopies of conifer trees. Red tree voles generally measure less than nine inches in length and have fur that ranges from brownish-red to orangish-red.



Photo by Patrick Wright

46.     Red tree voles are endemic to the humid, coniferous forests of western Oregon and northwestern California. Red tree voles in the north Oregon coast are genetically distinct from red tree voles in the southern and eastern portions of the species' range. Tree voles in the north Oregon coast are also uniquely adapted to consume western hemlock and Sitka spruce needles.

47.     The red tree vole is one of few mammals that are adapted to a diet of conifer needles, which allowed the species to abound in the once-abundant old-growth forests in Oregon and California. Using its teeth, a red tree vole strips the unpalatable resin duct from the needle and eats the remainder, like corn-on-the-cob.

48.     The location of the resin ducts is different on Douglas-fir, western hemlock, and Sitka spruce trees. Due to this, red tree voles are adapted to forage on the tree species that are native to their respective vegetation zones. Researchers have observed, for example, that red tree voles adapted to a diet of western hemlock will starve to death before resorting to eating readily available Douglas-fir needles. This suggests that learned foraging behaviors limit the red tree vole's ability to shift its diet from its preferred trees to other tree species.

49.     To nest successfully, red tree voles rely on unfragmented, old-growth conifer trees. Using twigs, discarded resin ducts, fecal pellets, lichens, and conifer needles, red tree voles nest on large branches or other supportive structures. While red tree voles have been observed to nest in grand fir, Pacific yew, and non-conifers such as bigleaf maple and golden chinquapin, they prefer Douglas-fir, Sitka spruce, and western hemlock.

50.     One of the most essential habitat characteristics for the red tree vole is the complex canopy of interconnected branches of old-growth trees. As a mammal uniquely adapted to an arboreal life, the red tree vole spends nearly all its time within tree canopies and depends on interconnected branches to move between trees. Because of the high productivity of old-growth forests, the red tree vole need not travel far from its nest for food. Having evolved in such conditions, a red tree vole typically has a small home range that encompasses its nest tree and a few nearby trees.

51.     Red tree voles seldom venture far from their natal nests when dispersing as sub-adults. A study found that red tree voles can disperse an average of 183 feet ("ft.") from their natal nests, but some venture only 10 ft. to establish territories. The longest known dispersal of a sub-adult red tree vole is 1,115 ft., about two-tenths of a mile, and that red tree vole, a male, took 40 days to complete the journey.

52.     Due to small home ranges and short dispersal distances, red tree voles do not readily colonize new areas. Instead, populations expand incrementally, over many generations. It can take years for red tree voles to develop stable populations in newly mature forests.

53.     For the foregoing reasons, the red tree vole's ecology makes it extremely vulnerable to habitat fragmentation. Without the habitat features found in old-growth forests, red tree voles cannot move through the canopy from tree to tree. Instead, they must descend from the tree canopy and travel across the ground, where they are far more susceptible to predators. Even small disturbances to red tree vole habitat can greatly decrease connectivity for the species.

## PROCEDURAL BACKGROUND

### *Plaintiffs' Petition*

54.     There has been a dramatic decline of tree voles on the north Oregon coast due to historic and ongoing habitat loss from logging and wildfire, habitat fragmentation, isolated populations, and inadequate regulatory mechanisms. In response, on June 18, 2007, the Center and six other conservation groups and individuals petitioned the Service to list the "dusky tree vole" as an endangered or threatened subspecies of the red tree vole. At that time, it was unclear whether the tree vole warranted listing as a subspecies or as a DPS. Thus, they petitioned to list the population of the red tree vole that occurs in the area of the north Oregon coast range as an endangered or threatened DPS under the ESA, in the alternative to protection as a subspecies.

*The Tree Vole's Listing History*

55.     In a 90-day finding published on October 28, 2008, the Service concluded that

listing as endangered or threatened "may be warranted" for: (a) the dusky tree vole, a subspecies

of the red tree vole; (b) a "North Oregon Coast" DPS of red tree vole; or (c) the entire species. 73

Fed. Reg. 63,919 (Oct. 28, 2008). The Service based its 90-day finding on three of the ESA's

five listing factors: (1) present or threatened destruction, modification, or curtailment of its

habitat or range; (2) inadequacy of existing regulatory mechanisms; and (3) other natural or

manmade factors. *Id.* at 63,924–26.

56.     The Service then initiated a status review to determine whether listing any of the

three red tree vole entities under the ESA was warranted.

57.     On October 13, 2011, the Service published its first "warranted-but-precluded"

finding for the species. 76 Fed. Reg. 67,720. In it, the Service determined that the north Oregon

coast population of the red tree vole warrants listing under the ESA as a DPS. *Id.* at 63,753–

63,756. The Service defined the DPS boundaries as: the Willamette River Valley on the east, the

Siuslaw River on the south, the Pacific Ocean on the west, and the Columbia River on the north.

The DPS's range encompasses two distinct vegetation zones: the western hemlock zone, which is

dominated by Douglas-fir forests; and the Sitka spruce zone, which is dominated by Sitka spruce

and western hemlock forests.

58.     The Service found the north Oregon coast population of the red tree vole

constitutes a DPS because it is genetically distinct from individuals in the rest of the species'

range. *Id.* at 63,728–63,733. In addition, the Service concluded that loss of the population would

eliminate a unique genetic component, create a significant gap in the species' range, and result in

the loss of the unique Sitka spruce and western hemlock foraging behavior. *Id*. However, the

Service claimed higher-priority listing actions precluded listing the tree vole at that time. *Id.* at
63,753–62. As a result of this "warranted-but-precluded" finding, the DPS was classified as a
"candidate" for listing yet received none of the ESA's protections.

59.     The Service emphasized that the tree vole is threatened by "the maintenance of
poor quality forest habitats . . . and habitat fragmentation and isolation of small populations"
because of ongoing forestry activities, including logging. *Id.* at 63,739. It also noted that due to
its "biology and life history[,]" the tree vole is "especially vulnerable to habitat fragmentation,
isolation, and chance environmental disturbances such as large-scale fires that could reasonably
be expected to occur within the DPS within the foreseeable future." *Id.* at 63,740.

60.     The Service also found that existing regulatory mechanisms on state and private
lands were inadequate to conserve the tree vole. *Id.* at 63,747. According to the Service,
Oregon's intensive forestry activities and stand rotations would be detrimental to the red tree
vole. *Id.* Furthermore, the Service found that although there are some habitat protections for
other sensitive species on private and state lands, they likely are not effective for red tree voles.
*Id.* at 63,741–44.

61.     Following its 2011 warranted-but-precluded finding, the Service reaffirmed its
determination that the tree vole "warrants" listing no less than six times, in: 2012, 2013, 2014,
2015, 2016, and 2019. 77 Fed. Reg. 69,994, 70,011–12 (Nov. 21, 2012); 78 Fed. Reg. 70,104,
70,118 (Nov. 22, 2013); 79 Fed. Reg. 72,450, 72,462 (Dec. 5, 2014); 80 Fed. Reg. 80,584,
80,594–95 (Dec. 24, 2015); 81 Fed. Reg. 87,246, 87,255–56 (Dec. 2, 2016); 84 Fed. Reg. at
54,751 (Oct. 10, 2019). Each time, the Service reaffirmed the tree vole's status as a "candidate"
for the ESA's protections, but the species received none of these protections.

62.     In 2016, the last time the Service produced a species assessment before it reversed course in 2019, the Service found that "evidence suggests that red tree voles are now much less abundant within the DPS than they were historically." 2016 species assessment and listing priority assignment form ("2016 species assessment form") at 18. The Service also found that tree voles are "uncommon and sparsely distributed compared to the rest of the [DPS'] range … in the area within the DPS north of U.S. Highway 20," having been "eliminated from much of this area by fire, logging, and landscape conversion to industrial forests." *Id.* at 27.

63.     In its 2016 assessment, the Service reiterated the historic and ongoing threats to the tree vole—namely, habitat loss and fragmentation caused primarily by logging leading to small and isolated populations, inadequate regulatory mechanisms, and random events such as wildfires. *Id.* at 27–71.

64.     The Service recognized that "[t]he historical loss of large contiguous stands of older forest … primarily due to timber harvest … has manifested in the current primary threats to the North Oregon Coast DPS of the red tree vole of insufficient habitat, habitat fragmentation, and isolation of small populations." *Id.* at 28. The Service found that the effects of historic loss of habitat are a persistent threat, as the "ongoing management of most forests on State, County, and private lands for harvest on a short-rotation schedule have resulted in the destruction of the older forest habitats favored by red tree voles." *Id.*

65.     As a result, the tree vole and its old-growth forest habitat "now persist largely in small, isolated fragments across the DPS." *Id.* The Service explained that "[n]ot only have amounts of older forests decreased, but the spatial distribution of those forest has changed," with patches of old-growth forest increasingly smaller and farther removed from other remnants. *Id.* at 54.

66.     Having evolved in "vast, well-distributed expanses of primarily late-successional forest[,]" the Service found that red tree voles are especially sensitive to the negative effects of habitat fragmentation and isolation due to their limited dispersal capabilities, which hinder the species' ability to recolonize lost areas resulting in the potential loss of local populations and inbreeding depression. *Id.* at 53–58.

67.     The Service further concluded that "the isolation of red tree vole populations due to fragmentation of their remaining older forest habitat, independent of the total area of suitable habitat that may be left, poses a significant threat to the red tree vole within the DPS," and may be "more important than habitat area as a determinant of extinction probability." *Id.* at 64–65.

68.     Prior to reversing course, the Service also determined that habitat loss and fragmentation were in part a result of and compounded by inadequate regulatory mechanisms on private and state lands which make up approximately 80 percent of the DPS's range. *Id.* at 39–48. In addition to the lack of any meaningful protective regulatory mechanisms on private lands, the Service found that the State of Oregon lacks adequate regulatory mechanisms, because "[a]lthough the State does manage their forests with an eventual increase in older forest conditions as a goal, most of the State lands within the DPS are managed for some level of continuing timber harvest[,]" and "there are no mechanisms in place to protect existing occupied tree vole sites outside of [designated] retention areas." *Id.* at 48. Thus, the Service found that "existing regulatory mechanisms on State land are inadequate to provide for the conservation of the North Oregon Coast DPS of the red tree vole, as they contribute to threats of habitat destruction, modification, or curtailment[,]" as well as "habitat fragmentation and isolation of small populations." *Id.*

69.     Because of these inadequate protective regulatory mechanisms, the Service found "no evidence to suggest the present dearth of suitable habitat for the red tree vole [DPS] will be alleviated by the modest projected increases in older forest conditions on Federal and State lands within the DPS." *Id.* at 35. Regardless of any gains, habitat would remain fragmented "due to the management practices on intervening private lands that inhibit connectivity." *Id.* Even a "potential gain of 20 percent more suitable habitat … is likely not sufficient to offset the loss, modification, and fragmentation of habitat and isolation of populations that collectively pose an immediate threat to the red tree vole in the DPS." *Id.*

70.     The Service did not find that protections on federal lands alleviate threats to habitat, because "Federal lands make up less than a quarter of the area of the DPS" and "suitable red tree vole habitat will remain restricted in size, in distribution, and in a fragmented, isolated condition for the foreseeable future." *Id.* at 37. Furthermore, the agency found that federally managed lands north of Highway 20 are "insufficient to support stable populations" because of the "combination of small amounts of Federal land, limited connectivity between these lands, and few known vole sites[.]" *Id.* at 51. Thus, habitat fragmentation on isolated Federal land north of Highway 20 is a threat, as it "restricts red tree vole distribution and magnifies the effect of habitat loss occurring from [random] events, further limiting the red tree vole[']s ability to persist in an area or recolonize new sites." *Id.*

71.     Prior to its change in position, in 2016 the Service also concluded that climate change and wildfire threatened the tree vole, noting that "[f]orests in the Pacific Northwest face an increased risk of large-scale fires within the foreseeable future," with climate change anticipated to result "in an extended period of high fire risk and large increase in area burned."

*Id.* at 60. The Service cited "estimated increases in regional forest areas burned over the next century rang[ing] from 180 to 300 percent." *Id.*

72.     Moreover, in 2016 the Service determined that the threat posed by wildfires was potentially existential for the tree vole, "[c]onsidering that the majority of the remaining tree vole habitat in the DPS is limited to Federal land" and "restricted to two separate clusters in the DPS," making it "certainly possible to lose much of the Federal land in either of these blocks to a single stand-replacement fire, further limiting habitat and restricting the range of the tree vole in the DPS." *Id.*

73.     The Service further acknowledged that the threat from wildfires is compounded by historic and ongoing habitat loss and fragmentation due to logging, with the Service concluding: "[a]lthough large fires occurred within the DPS historically, in the past there were many additional areas of older forest that were less isolated from other older forest stands and could serve as a population source or as refugia for tree voles displaced from forests that burned; under current conditions, there are few such refugia available." *Id.*

74.     Further doubting the prospect for survival of the tree vole solely on federal lands, the Service specifically noted that past fires in the Coast Range burned areas "twice as large as either of the remaining clusters of Federal land within the DPS," and that climate change is likely to result in "increased risk and magnitude of fire"—thus, it is "reasonably likely that a single stand-replacing fire could occur within the foreseeable future … [and] would eliminate much of the remaining suitable habitat for tree voles within the DPS." *Id.*

75.     As a result, "[b]ecause of the existing habitat conditions, the limited ability of the red tree vole to persist in much of the DPS, and its vulnerability in the foreseeable future until

habitat conditions improve, [the Service determined] that the North Oregon Coast DPS of the red tree vole … is in danger of extinction now or in the foreseeable future." *Id.* at 71.

76.     Thus, for these reasons, beginning in 2011 and through October 2019, the Service consistently maintained that the tree vole "warrants" protection under the ESA as an endangered or threatened species.

**The 2019 Species Status Assessment**

77.     Prior to issuing the not-warranted finding in late 2019, the Service conducted a "species status assessment" ("SSA"), which was "intended to be a concise review of the species' biology and factors influencing the species, an evaluation of its biological status, and an assessment of the resources and conditions needed to maintain long-term viability," but not provide a determination of whether the tree vole should be listed as endangered or threatened. SSA at 1.

78.     The SSA reiterated many of the Service's previous conclusions concerning the status of the tree vole.

79.     As in previous findings, the SSA acknowledged the tree vole "has lost viability over the past 100 years due to the loss of habitat that has not been restored or regrown, combined with an associated decline or extirpation of voles in these areas[,]" primarily due to timber harvest and wildfire. SSA at 92. It also acknowledged that continued timber harvest, in conjunction with wildfire compounded by climate change, will continue to restrict the tree vole's range and threaten its viability. *Id.*

80.     Regarding habitat fragmentation and isolation, the SSA concluded that "[t]he loss of much of the older forest within the [tree vole's range] has reduced high-quality habitat for tree voles to relatively isolated patches," and that tree voles "are especially vulnerable to the effects

of isolation and fragmentation due to their small home ranges and limited dispersal capabilities." *Id.* at 43. The SSA noted that "[n]ot only have the amounts of older forest decreased, but the spatial distribution has changed[,]" resulting in "a fragmented network of smaller patches scattered through a matrix of predominantly young forest." *Id.* at 44.

81.     The SSA found that the effects of habitat loss and fragmentation, and the isolation of small populations with "a lack of gene flow sufficient to maintain diversity and evolutionary potential within the population," is resulting in "inbreeding depression, reduced fitness, [genetic] bottlenecks, deleterious mutations, and genetic drift." *Id.* Additionally, the SSA recognized that "clusters as remnant habitat patches formerly occupied by tree voles" could be lost, and "may not be recolonized due to the distance between habitat fragments and the short-distance dispersal of the species, leading to local extirpation and further isolation of the remaining clusters, and likely local extirpations." *Id.* at 44–45. Indeed, the SSA noted that habitat fragmentation may ultimately be a more significant threat than habitat loss for the tree vole. *Id.* at 46.

82.     The SSA identified 11 "habitat clusters" possibly large enough to support tree vole populations with more than 100 individual tree voles, and assessed their resiliency under four scenarios. *Id.* at 67. Of these 11 habitat clusters, only two—the "Nestucca Block" and the "South Block," which contain relatively higher concentrations of federal lands—are identified as sufficiently resilient to withstand threats, currently or under various future scenarios.

83.     The SSA acknowledged, however, that even these two clusters suffer from ongoing habitat loss and fragmentation. Indeed, the Service pointed out that nearly half (about 46 percent) of the South Block, the larger of these two (out of 11) clusters, consists of private lands, where "habitat is much more fragmented" and where "management over time may [further]

fragment" the cluster, "effectively reducing the size of South Block and splintering it into smaller clusters." *Id.* at 88.

84.     As in past findings, the SSA recognized that wildfire could result in "loss of either or both of these habitat clusters," *id.* at ii, with the Nestucca Block "small enough that it could be completely consumed by a single fire event typical of historic wildfires." *Id.* at 65. Moreover, the SSA recognized that "it is expected that weather conditions conducive to producing past large-scale wildfires will increase with predicted climate change." *Id.* at ii.

85.     Of the nine other habitat clusters, the SSA concluded four "will become extirpated over time" and one cluster has a "low overall resiliency score at 60 years," is isolated from other clusters, and faces ongoing threats to its habitat. SSA at ii, 91. The remaining four clusters, outside of the Nestucca Block and South Block, "may" maintain an "overall moderate resiliency score" over time, but are "at risk for loss of genetic diversity and the evolutionary capacity to adapt to changing environments"—which, when compounded with the effects of climate change, puts "these moderate clusters at more risk to extirpation." *Id.* at 91. Overall, the SSA concluded that the nine clusters "are substantially smaller in area and population size, isolated from neighboring clusters, and are less resilient to stochastic events," particularly wildfire. SSA at 64.

**The Challenged Agency Action: The Service's Not-Warranted Finding**

86.     In a baseless reversal of its many prior determinations, since 2011, that the tree vole warrants ESA protection due to the species' dire status and grave threats, the Service in late 2019 determined that the tree vole does not warrant listing as endangered or threatened. The Service's reversal, as well as the "species assessment and listing priority assignment form"

("2019 species assessment form") that supports the not-warranted finding, rely heavily on the tree vole's persistence within the Nestucca Block and South Block. 84 Fed. Reg. at 69,710.

A. **The Service ignored its many prior determinations, based on the best available science, that the tree vole's existence is at imminent risk from wildfire, habitat loss and fragmentation, and inadequate existing regulations.**

87.     The Service's reliance on the Nestucca Block and South Block to find that the tree vole is not in danger of extinction now or in the foreseeable future ignored the agency's own, consistent determinations that wildfire alone could eliminate or devastate either one or both of these habitat clusters at any time, and that climate change is increasing this likelihood. In discounting this threat, the Service relied on what it purported to be "uncertainty," stating that the Service could not "project the probability and location of catastrophic events such as wildfire through time" or in the foreseeable future. 2019 species assessment form at 12–13, 20–21. In doing so, the Service ignored, without explanation, its many previous, consistent findings to the contrary, e.g., that it is "reasonably likely that a single stand-replacing fire could occur within the foreseeable future that would eliminate much of the remaining suitable habitat for tree voles within the DPS." 2016 species assessment form at 60.

88.     The Service also failed to explain how two habitat clusters out of 11 can be expected to secure the persistence of the tree vole, particularly in light of the agency's previous conclusions that "[f]orests in the Pacific Northwest face an increased risk of large-scale fires within the foreseeable future," due to climate change, that will result "in an extended period of high fire risk and large increase in area burned," and "increases in regional forest areas burned over the next century rang[ing] from 180 to 300 percent." *Id.*

89.     Nevertheless, in relying on these two clusters and the tree vole's persistence on federal lands within them, the Service also ignored its prior findings that the limited and

scattered nature of current tree vole habitat—including on federal lands which make up less than a quarter of the tree vole's range—leaves the tree vole vulnerable to extinction because "suitable red tree vole habitat will remain restricted in size, in distribution, and in a fragmented, isolated condition for the foreseeable future." *Id.* at 37.

90.     The Service similarly ignored its prior findings that federal lands north of Highway 20, including the Nestucca Block, are "insufficient to support stable populations" because of the "combination of small amounts of Federal land, limited connectivity between these lands, and few known vole sites[.]" *Id.* at 51. The Service also ignored its own conclusions that even the South Block will continue to further fragment over time due to inadequate regulatory mechanisms on private lands within the block, "effectively reducing the size of South Block and splintering it into smaller clusters." SSA at 88.

91.     The Service failed to consider whether existing regulatory mechanisms are adequate to protect the tree vole across its range, although the agency admitted that there are few-to-no regulatory protections in place on state and private lands, and that such lands make up nearly 80 percent of the tree vole's range (as well as substantial portions of the Nestucca and South blocks).

92.     Finally, the Service failed to explain why the red tree vole is not in danger of extinction, now or in the foreseeable future, from the loss of most of its historic range. Despite this, the Service concluded the tree vole does not warrant listing.

**B.   The Service failed to consider whether the tree vole is endangered or threatened in a significant portion of its range.**

93.     Despite recognizing that the tree vole has been lost from most of its range, faces ongoing threats to its survival from logging, wildfire, climate change, and additional threats, and has few regulatory mechanisms in place to protect it, the Service determined that the species is

not endangered or threatened in a "significant portion of its range." 2019 species assessment form at 32–34. In doing so, the Service failed to consider whether the nearly 80 percent of the species' remaining range that is located on state and private lands—where there are few protections and ongoing habitat destruction—qualifies as a "significant portion" of the species' range and where it may be endangered or threatened.

94.    The Service similarly failed to consider whether the nine habitat clusters that are facing imminent threats to their survival, including four clusters predicted to be lost under all scenarios, constitute a significant portion of the tree vole's range, even as the agency acknowledged that the vole is threatened in these clusters from habitat loss, inbreeding, isolation, and the lack of adequate regulatory mechanisms.

95.    Rather than considering whether the tree vole is endangered or threatened in these portions of its range, the Service applied its SPR Policy and focused on whether the tree vole faced a "concentration of threats" within its range "at a biologically meaningful scale." *Id.* at 33. The Service answered this question in the negative. *Id.*

96.    By focusing solely on whether threats are "concentrated" in these clusters at a "biologically meaningful scale," and ignoring the threats to the tree vole in these portions of its range, the Service skirted the fundamental question: whether the red tree vole is in fact endangered or threatened (i.e., at risk of extinction or of becoming endangered in the foreseeable future) in a *significant portion of range*. In fact, threats such as logging threaten its survival in portions of its range for a variety of reasons, including lack of available habitat, population isolation, low abundance, and inadequate regulatory mechanisms—as the Service itself has previously, consistently maintained.

97.     Regardless of the validity of the Service's myopic focus on whether there is a "concentration of threats" in these areas, the Service disregarded the fact, as it previously acknowledged, that the tree vole does in fact face a concentration of threats on state and private lands which make up the majority of its remaining range, including threats such as habitat destruction and fragmentation from logging, inadequate existing regulatory mechanisms, small population size, and isolation. But the Service failed to even consider whether state and private lands constitute a significant portion of the tree vole's range.

## PLAINTIFFS' CLAIMS FOR RELIEF

### First Claim for Relief
### (ESA Claim)

***The Service Failed to Comply with Nondiscretionary Duties under the ESA When It Decided Not to List the Red Tree Vole as an Endangered or Threatened Species***

98.     Plaintiffs re-allege and incorporate by reference the allegations set forth in the preceding paragraphs.

99.     The Service "shall . . . determine whether any species is an endangered species or a threatened species" because of any one or combination of five listing factors. 16 U.S.C. § 1533(a)(1). When doing so, the Service must rely "solely on the best scientific and commercial data available." *Id.* § 1533(b)(1).

100.    The tree vole warrants listing as an endangered or threatened species because the best available scientific information demonstrates that the species is in danger of extinction or is likely to become an endangered species within the foreseeable future throughout all of its range from many historic and ongoing threats including habitat loss, habitat fragmentation, isolated populations, wildfire, climate change, and inadequate regulatory mechanisms.

101.    The tree vole also warrants listing as an endangered or threatened species because the best available scientific information demonstrates that the tree vole is in danger of extinction or likely to become an endangered species within the foreseeable future *in a significant portion of its range*, on state and private lands and/or within nine of 11 remaining habitat clusters, from many historic and ongoing threats including habitat loss, habitat fragmentation, isolated populations, fire, climate change, and inadequate regulatory mechanisms.

102.    The Service failed to rely on the best available scientific data available when it found that the tree vole does not warrant listing as either an endangered or threatened species throughout all or a significant portion of its range.

103.    The Service failed to make a rational connection between the agency's prior determinations—i.e. that the species is at risk of extinction now and in the foreseeable future in all or a significant portion of its range—and the agency's conclusion to the contrary, in the not-warranted finding, that the tree vole does not warrant listing as either an endangered or threatened species.

104.    The Service's not-warranted finding fails to provide a rational connection between the facts the agency found and the choice it made, ignores important aspects of the threats facing the tree vole, and fails to provide a reasoned explanation for the agency's departure from its prior, consistent position that the tree vole warrants listing as an endangered or threatened species.

105.    Accordingly, the Service's not-warranted finding is contrary to the best available science, dismisses threats that warrant protection, violates the ESA, and is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law. 16 U.S.C. § 1533; 5 U.S.C. § 706(2)(A).

**Second Claim for Relief (in the Alternative to Plaintiffs' First Claim for Relief)
(APA Claim)**

*The Service's Not-Warranted Finding is Arbitrary and Capricious*

106.    Plaintiffs re-allege and incorporate by reference the allegations set forth in the preceding paragraphs.

107.    When making the not-warranted finding, the Service was required to articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made. The Service cannot rely on factors Congress did not intend the agency to consider, ignore an important aspect of the problem, offer an explanation that runs counter to the evidence before the agency, or issue a finding so implausible that it cannot be ascribed to a difference in view or the product of agency expertise.

108.    The Service was also required to provide a reasoned explanation for departing from its own prior determinations, from 2011 through 2019, that the tree vole warrants listing as an endangered or threatened species because of the vast reduction of its historic range and ongoing threats where it still survives, including habitat loss, fragmentation, isolation, wildfire, and the lack of adequate existing regulatory mechanisms on state and private lands.

109.    The tree vole remains in danger of extinction, or is likely to become in danger of extinction within the foreseeable future, throughout all or in a significant portion of its range, because of historic and ongoing threats including habitat loss, fragmentation, isolation, wildfire, and the lack of adequate existing regulatory mechanisms on state and private lands.

110.    The Service's not-warranted finding fails to provide a rational connection between the threats facing the tree vole and the finding that the red tree vole does not warrant listing as an endangered or threatened species, or a reasoned explanation for the agency's

departure from its own prior, consistent determinations that the tree vole warrants listing as an endangered or threatened species.

111.   Accordingly, the Service's not-warranted finding is arbitrary, capricious, an abuse of discretion, and not in accordance with law, 5 U.S.C. § 706(2)(A).

**REQUEST FOR RELIEF**

THEREFORE, Plaintiffs respectfully request that this Court:

(1)   Declare unlawful and set aside Defendants' not-warranted finding;

(2)   Remand the not-warranted finding to Defendants for further analysis and a new listing determination by a date certain that is consistent with the ESA, APA, and this Court's order;

(3)   Award Plaintiffs reasonable attorneys' fees, costs, and expenses; and

(4)   Grant Plaintiffs such further and additional relief as the Court may deem just and proper.

DATE: March 25, 2021                    Respectfully submitted,

*/s/ Ryan Adair Shannon*
Ryan Adair Shannon (OR Bar No.155537)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 11374
Portland, OR 97211
Tel: (917)717-6407
rshannon@biologicaldiversity.org

Amy R. Atwood (OR Bar No. 060407)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 11374
Portland, OR 97211
Tel: (917) 717-6401
atwood@biologicaldiversity.org

*Attorneys for Plaintiffs*