RYAN SHANNON (OSB # 155537)
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211-0374
Phone: 503-283-5474 ext. 407
Email: rshannon@biologicaldiversity.org

BRIAN SEGEE (Cal. Bar No. 200795)
Center for Biological Diversity
660 S. Figueroa Street, Suite 1000
Los Angeles, CA 90017
Phone: (805) 750-8852
Email: bsegee@biologicaldiversity.org
*Pro Hac Vice*

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

# PORTLAND DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; CASCADIA WILDLANDS; OREGON WILD; AND AUDUBON SOCIETY OF PORTLAND, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. FISH AND WILDLIFE SERVICE; MARTHA WILLIAMS, in her official capacity as Principal Deputy Director of the U.S. Fish and Wildlife Service; and DEBRA HAALAND, in her official capacity as Secretary of the United States Department of the Interior, <br><br> Defendants. | Case No. 3:21-cv-00455-HZ <br><br> **MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT** <br><br> Request for Oral Argument |

Pursuant to Federal Rule of Civil Procedure 56, Plaintiffs, the Center for Biological

Diversity, Cascadia Wildlands, Oregon Wild, and Audubon Society of Portland, hereby move for

summary judgment on claims challenging Defendants' decision that the north Oregon coast

Motion for Summary Judgment and Memorandum in Support
Case No. 3:21-cv-00455-HZ

distinct population segment of the red tree vole does not warrant listing as an endangered or threatened species based on threats throughout all or a significant portion of its range under the Endangered Species Act, 16 U.S.C. §§ 1531–1544. Complaint, ECF 1. The Plaintiffs seek an order vacating this decision and remanding the matter to the U.S. Fish and Wildlife Service to issue a new determination regarding whether the tree vole warrants protection under the Endangered Species Act as an endangered or threatened species within a year of the Court's order. This motion is supported by the accompanying memorandum, the concurrently filed declarations, and the administrative record lodged by Defendants.

Respectfully submitted this 29th day of October, 2021.

*/s/ Ryan Shannon*
RYAN SHANNON (OSB # 155537)
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211-0374
Phone: 503-283-5474 ext. 407
Email: rshannon@biologicaldiversity.org

BRIAN SEGEE (Cal. Bar No. 200795)
Center for Biological Diversity
660 S. Figueroa Street, Suite 1000
Los Angeles, CA 90017
Phone: (805) 750-8852
Email: bsegee@biologicaldiversity.org
*Pro Hac Vice*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

STATUTORY AND REGULATORY BACKGROUND ................................................... 2

FACTUAL & PROCEDURAL BACKGROUND .............................................................. 5

    I.     The Tree Vole ......................................................................................................... 5

    II.    The Tree Vole's Listing History ........................................................................... 7

    III.   The 2019 Species Status Assessment .................................................................. 11

    IV.   The Challenged Agency Action: The Service's Not-Warranted Finding ......................... 12

STANDARD OF REVIEW ............................................................................................... 13

ARGUMENT ..................................................................................................................... 14

    I.     The Conservation Groups Have Article III Standing to Challenge the Not-Warranted
         Finding ................................................................................................................. 14

    II.    The Service Failed to Explain Its About-Face Determination That the Tree Vole No
         Longer Warranted Endangered Species Act Protection ................................................ 15

    III.   The Service Failed to Follow the Best Available Science When the Service Improperly
         Dismissed the Threat of Wildfire Due to Alleged Uncertainty ....................................... 19

    IV.   The Service Failed to Adequately Consider Whether the Tree Vole is Threatened or
         Endangered in a Significant Portion of Its Range ........................................................ 22

         A.   The Service's Failure to Analyze Whether the Tree Vole is in Fact Endangered or
             Threatened in a Significant Portion of Its Range Violates the Endangered Species
             Act .............................................................................................................. 23

         B.   The Tree Vole Is in Danger of Extinction, Now and in the Foreseeable Future, in a
             Significant Portion of its Range ..................................................................... 24

         C.   The Service Failed to Explain Why the Tree Vole Is Not Endangered or Threatened in
             a Significant Portion of Its Range .................................................................. 27

REMEDY ........................................................................................................................... 29

CONCLUSION .................................................................................................................. 30

## TABLE OF AUTHORITIES

### CASES

*Alaska Oil & Gas Ass'n v. Pritzker*,
    840 F.3d 671 (9th Cir. 2016)..................................................................... 4, 22

*Ariz. Cattle Growers' Ass'n v. Salazar*,
    606 F.3d 1160 (9th Cir. 2009)........................................................ 13, 20, 23

*Biodiversity Legal Found. v. Badgley*,
    309 F.3d 1166 (9th Cir. 2002)................................................................ 14, 15

*Ctr. for Biological Diversity v. Haaland*,
    998 F.3d 1061 (9th Cir. 2021)................................................................ passim

*Ctr. for Biological Diversity v. Zinke*,
    900 F.3d 1053 (9th Cir. 2018)....................................... 16, 18, 20, 22

*Defs. of Wildlife v. Norton*,
    258 F.3d 1136 (9th Cir. 2001)................................................................ passim

*Fed. Commc'n Comm'n v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ............................................................................... 16

*Fed. Election Comm'n v. Akins*,
    524 U.S. 11 (1998) ................................................................................. 30

*Friends of the Earth, Inc. v. Laidlaw Env'tl Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ............................................................................... 15

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*,
    378 F.3d 1059 (9th Cir. 2004)................................................................ 27

*Greater Yellowstone Coal., Inc. v. Servheen*,
    665 F.3d 1015 (9th Cir. 2011)................................................................ 13, 21

*Humane Soc'y of the United States v. Zinke*,
    865 F.3d 585 (D.C. Cir. 2017) .............................................................. 4

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ............................................................................... 14, 15

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ................................................................................. 13, 24

*Native Ecosystems Council v. U.S. Forest Serv.*,
    418 F.3d 953 (9th Cir. 2005).................................................................. 13

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
    747 F.3d 581 (9th Cir. 2014).................................................................. 20

*Tenn. Valley Auth. v. Hill*,
    437 U.S. 153 (1978) ............................................................................... 3

*Trout Unlimited v. Lohn*,
  645 F. Supp. 2d 929 (D. Or. 2007)........................................................................... 30

*Tucson Herpetological Soc'y v. Salazar*,
  566 F.3d 870 (9th Cir. 2009)............................................................. 27, 28, 29, 30

## STATUTES

5 U.S.C. § 706(2)(A)............................................................................................. 13, 30

16 U.S.C. § 1531(b) ..................................................................................................... 3

16 U.S.C. § 1532(5) ..................................................................................................... 4

16 U.S.C. § 1532(6) ........................................................................................... 3, 22, 23

16 U.S.C. § 1532(16) ................................................................................................... 3

16 U.S.C. § 1532(19) ................................................................................................... 4

16 U.S.C. § 1532(20) ......................................................................................... 3, 22, 23

16 U.S.C. § 1533(a)(1)................................................................................... 3, 4, 22, 23

16 U.S.C. § 1533(a)(3)................................................................................................. 4

16 U.S.C. § 1533(b)(1)(A) ........................................................................................... 4

16 U.S.C. § 1533(b)(3)(A) ..................................................................................... 5, 30

16 U.S.C. § 1533(b)(3)(B) ......................................................................................... 30

16 U.S.C. § 1533(b)(3)(B)(i) ....................................................................................... 5

16 U.S.C. § 1533(b)(3)(B)(ii) ...................................................................................... 5

16 U.S.C. § 1533(b)(3)(B)(iii) ..................................................................................... 5

16 U.S.C. § 1533(b)(3)(C)(i) ....................................................................................... 5

16 U.S.C. § 1533(b)(6)(A) ......................................................................................... 30

16 U.S.C. § 1533(C)(ii) ............................................................................................... 5

16 U.S.C. § 1533(f) ..................................................................................................... 4

16 U.S.C. § 1536(a)(2)................................................................................................. 4

16 U.S.C. § 1538(a)(1)(B) ........................................................................................... 4

16 U.S.C. § 1540(g)(1)(C) ......................................................................................... 30

## REGULATIONS

50 C.F.R. § 424.11(c)................................................................................................... 4

50 C.F.R. § 424.14(a)................................................................................................... 5

50 C.F.R. § 424.14(h)(3).............................................................................................. 5

# INTRODUCTION

The north Oregon coast distinct population segment ("DPS") of the red tree vole (*Arborimus longicaudus*) ("tree vole"), an arboreal mammal that rarely visits the ground and uniquely subsists on a diet of conifer needles, is in danger of extinction. Extirpated from large portions of its range, the tree vole continues to lose habitat to logging and other threats. Most of the remaining pockets of habitat are isolated from one another, preventing the tree vole from recovering from these threats, and all are at risk of being lost to wildfire. Critically, the tree vole receives little-to-no protection on the private and state lands that make up most of its range.

Because of the severity of these threats and the tree vole's precarious status, Plaintiffs (the "Conservation Groups") petitioned the Service on June 18, 2007, to list the tree vole as endangered or threatened under the Endangered Species Act ("ESA" or "Act"). FWS_24105–24173. On October 13, 2011, the U.S. Fish and Wildlife Service ("Service") agreed and determined that the tree vole warranted listing as an "endangered" or "threatened" species. FWS_24051–24093. Rather than list the tree vole, however, the Service determined listing was "precluded" by other, purportedly higher-priority listing activities, and on that basis, designated the tree vole as a "candidate" species, i.e., a species waiting for the Service to promulgate a rule protecting it as endangered or threatened. FWS_24051. The Service subsequently reaffirmed the need for listing the tree vole on six separate occasions—most recently, on October 10, 2019. FWS_23911–23978; FWS_23782–23841; FWS_23662–23710; FWS_23559–23590; FWS_23438–23464; FWS_23364–23389.

On December 19, 2019—just two months later—the Service abruptly reversed course and determined the tree vole does not qualify as an endangered or threatened species. FWS_00011–00016 ("not-warranted finding"). With this reversal, the Service dropped the tree vole from the

list of candidate species awaiting protection and found that the tree vole was not in danger of extinction throughout all or a significant portion of its range, now or in the foreseeable future.

Despite previously recognizing multiple times, over the course of nearly a decade, that the tree vole has been eliminated from most of its historic range due to the logging of its old-growth habitat and wildfire, the not-warranted finding concludes the tree vole is not at risk of extinction because it survives in two isolated pockets of federal land. In so doing, the Service dismissed and disregarded its own prior determinations that wildfire is an existential threat to the species (a threat exacerbated by climate change) and that regulations on private and state lands are inadequate to protect the tree vole. Compounding these errors, the Service failed to consider whether the tree vole is in danger of extinction in the significant portion of its range, specifically on private and state lands, where the tree vole is unquestionably at risk of extinction, or in nine of the remaining eleven habitat clusters, which face imminent threats to their survival. Had the Service conducted such an analysis, the tree vole undoubtedly would have been found to warrant listing as threatened or endangered.

For these reasons, the Service's not-warranted finding is arbitrary and capricious and violates the ESA. To remedy these violations, the Conservation Groups seek an order vacating the Service's not-warranted finding and remanding the matter to the Service to issue a new determination regarding whether the tree vole warrants protection under the ESA as an endangered or threatened species within a year of the Court's order.

## STATUTORY AND REGULATORY BACKGROUND

### Endangered Species Act

The Supreme Court has stated that the ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*,

437 U.S. 153, 180 (1978). Its purpose is to provide "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved," and "a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).

*ESA Listing and Protections*

The ESA directs the Service to add species it determines are endangered or threatened to a list of endangered and threatened species, a process known as "listing." *Id*. § 1533(a)(1). A "species" includes "any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." *Id*. § 1532(16). A species is "endangered" when it "is in danger of extinction throughout all or a significant portion of its range." *Id*. § 1532(6). A species is "threatened" when it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

The ESA does not define what constitutes a "significant portion" of a species' range. However, in 2014, the Service and the National Marine Fisheries Service promulgated a "Final Policy on the Phrase 'Significant Portion of Its Range' in the [ESA's] Definitions of 'Endangered Species' and "Threatened Species.'" 79 Fed. Reg. 37,578 (July 1, 2014). This policy provides that "a key part" of whether a species is at risk in a significant portion of its range is "whether the threats are geographically concentrated in some way." *Id.* at 37,586.

Whether a species is endangered or threatened "throughout all" of its range is separate and distinct from the question of whether a species is endangered or threatened in a "significant portion of its range." *Defs. of Wildlife v. Norton*, 258 F.3d 1136, 1142 (9th Cir. 2001). In making listing determinations, the Service must assess five categories of threats, also known as "listing factors," which are: "(A) the present or threatened destruction, modification, or curtailment of [the species'] habitat or range; (B) overutilization for commercial, recreational, scientific, or

educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence." 16 U.S.C. § 1533(a)(1). The Service must list the species if it is "endangered" or "threatened" because of "any one or a combination of" the five listing factors. 50 C.F.R. § 424.11(c); *see* 16 U.S.C. § 1533(a)(1). The Service must also "analyze or consider" the impacts of "of historical range loss…." *Humane Soc'y of the United States v. Zinke*, 865 F.3d 585, 589 (D.C. Cir. 2017).

The Service must make listing determinations "solely on the basis of the best scientific … data available." 16 U.S.C. § 1533(b)(1)(A). This "best available science" requirement bars the Service from invoking scientific uncertainty to justify its refusal to list a species as "endangered" or "threatened." *Ctr. for Biological Diversity v. Haaland*, 998 F.3d 1061, 1070 (9th Cir. 2021) ("*CBD v. Haaland*"). Instead, the Service must consider the available data, even if that information does not provide clarity or absolute certainty. *Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d 671, 683 (9th Cir. 2016).

Listing is the crucial first step in fulfilling the ESA's purposes. Once listed, but not before, species are afforded numerous protections. For example, section 4 requires the Service to designate areas "essential to the conservation of the species" as "critical habitat" and to develop and implement recovery plans. 16 U.S.C. §§ 1533(a)(3), (f); 1532(5). Section 7(a)(2) requires all federal agencies to consult with the Service to ensure their actions are not "likely to jeopardize the continued existence" of listed species or "result in the destruction or adverse modification" of their critical habitat. *Id.* § 1536(a)(2). Section 9(a)(1)(B) makes it unlawful to "take" any endangered species, which means no person can "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" an endangered species without first receiving authorization from the Service. *Id.* §§ 1532(19), 1538(a)(1)(B).

*ESA Listing Petitions*

Any interested person can submit a petition to the Service to list a species as endangered or threatened. *Id.* § 1533(b)(3)(A); 50 C.F.R. § 424.14(a). Within twelve months of receiving a listing petition that "presents substantial scientific or commercial information indicating that the potential action may be warranted," 16 U.S.C. § 1533(b)(3)(A), the Service must determine whether: (1) the petitioned actions is "warranted"; (2) the petitioned action is "not warranted"; or (3) the petitioned action is warranted, but listing is presently "precluded" by other proposals to list, delist, or reclassify the status of listed species. *Id.* § 1533(b)(3)(B)(i)-(iii).

If the Service issues a 12-month finding that listing the species is "warranted," it must publish in the Federal Register a "general notice and the complete text of a proposed regulation" listing the species as endangered or threatened. *Id.* § 1533(b)(3)(B)(ii). If the Service finds listing the species is "not warranted," that determination must be published in the Federal Register and is subject to judicial review. *Id.* § 1533(b)(3)(B)(iii), (C)(ii). If the Service issues a "warranted-but-precluded" 12-month finding, that finding also must be published in the Federal Register and is subject to judicial review. *Id.* § 1533(b)(3)(B)(iii), (C)(ii). A species that receives a warranted-but-precluded 12-month finding is classified as a "candidate" for listing, and the Service must reassess the status of such candidate species annually. *Id.* § 1533(b)(3)(C)(i); 50 C.F.R. § 424.14(h)(3).

## FACTUAL & PROCEDURAL BACKGROUND

### I.    The Tree Vole

The tree vole is a small arboreal rodent that spends almost all of its life in the canopies of conifer trees in the humid forests of the north Oregon Coast. FWS_06683–84. The Service recognizes the tree vole's range as bordered by the Willamette River Valley on the east, the

Siuslaw River on the south, the Pacific Ocean on the west, and the Columbia River on the north. FWS_24060.

Using twigs and needles, tree voles build nests in large trees with "cavities, large limbs and limb platforms, broken tops, hollow trunks, and deformed bole and branch structures," which are typically found in old-growth forests. FWS_06707–08. These forests also provide "abundant forage opportunities and maximiz[e] food availability for tree voles." FWS_06708.

One of the few mammals adapted to an exclusive diet of conifer needles, tree voles eat otherwise inedible needles by stripping the unpalatable resin duct and eating the remainder. FWS_06705. The tree vole is uniquely adapted to consume western hemlock and Sitka spruce needles. FWS_06705.

Tree voles have very small home ranges encompassing only their nest tree and a few surrounding trees. FWS_06706. Dispersal distances for tree voles are similarly small, averaging only 183 ft. FWS_06706. "This greatly restricts the ability of clusters of tree voles to expand and to establish new assemblages across the landscape. Because of this limited expansion capability, colonization may occur at a slow rate as multiple generations expand incrementally over time." FWS_06706–06707.

Given their limited ability to disperse from their home nests, tree voles are particularly vulnerable to forest fragmentation. FWS_06707.  When older forests are logged or killed by wildfire, tree voles cannot move through the canopy from tree to tree, and "relatively small distances between forest habitat patches may serve as effective barriers to movements and thus colonization of new sites for red tree voles." FWS_06707.

Although tree voles likely "occurred throughout much of the northern Oregon Coast Range prior to European settlement[,]" extensive logging and a series of historic wildfires greatly

reduced tree vole numbers. FWS_06685. Tree voles are now "scarce in areas where they were once found with relative ease," "much less abundant," and "mostly restricted to isolated populations in remnant stands of old forests on Federal and State lands." FWS_06689.

## II.    The Tree Vole's Listing History

In response to the dramatic decline of the tree vole combined with ongoing logging, threat of further wildfires, habitat fragmentation, population isolation, and inadequate regulatory mechanisms, the Conservation Groups petitioned the Service on June 18, 2007, to list the tree vole as an endangered or threatened species under the ESA. FWS_24105–24173. In response, on October 13, 2011, the Service determined that the tree vole warranted listing as an endangered or threatened species. FWS_24051.

In finding that the tree vole warranted listing, the Service emphasized that the species is threatened by "the maintenance of poor quality forest habitats . . . and habitat fragmentation and isolation of small populations" because of ongoing forestry activities, including timber harvest. FWS_24070. The Service also noted that the tree vole is "especially vulnerable to habitat fragmentation, isolation, and chance environmental disturbances such as large-scale fires that could reasonably be expected to occur within the DPS within the foreseeable future." FWS_24071. The Service additionally found existing regulatory mechanisms on private and state lands inadequate to conserve the tree vole. FWS_24078. According to the Service, the intensive forestry activities and short stand rotations on state lands would be detrimental to the tree vole. FWS_24078. Furthermore, the Service found that although there are some habitat protections for other sensitive species on private and state lands, they are likely ineffective for tree voles. FWS_24073, 24075.

Despite finding that listing was warranted, the Service determined that the tree vole's immediate listing was precluded by other listings the Service deemed a higher priority.

FWS_24051. As a result, the tree vole received none of the ESA's protections. Following the 2011 warranted-but-precluded finding, the Service reaffirmed that the tree vole "warranted" listing as an endangered or threatened species six times. FWS_23911–23978 (2012); FWS_23782–23841 (2013); FWS_23662–23710 (2014); FWS_23559–23590 (2015); FWS_23438–23464 (2016); FWS_23364–23389 (2019). Each time, the Service again maintained the tree vole was precluded from receiving the ESA's protections.

In 2016, the Service updated its "species assessment and listing priority form" ("2016 assessment") and concluded that "[t]he historical loss of large contiguous stands of older forest … primarily due to timber harvest … has manifested in the current primary threats to the [tree vole] of insufficient habitat, habitat fragmentation, and isolation of small populations." FWS_23492. Habitat destruction was found not only to have decreased the amount of older forest, but to have changed its "spatial distribution," making patches of old-growth forest increasingly smaller and farther removed from other remnants. FWS_23519. The 2016 assessment ultimately concluded that the resulting "isolation of red tree vole populations due to fragmentation of their remaining older forest habitat, independent of the total area of suitable habitat that may be left, poses a significant threat to the red tree vole within the DPS," and may be "more important than habitat area as a determinant of extinction probability." FWS_23531–23531.

The 2016 assessment also concluded that habitat loss and fragmentation were in part a result of and compounded by inadequate regulatory mechanisms on private and state lands— which make up approximately 80 percent of the tree vole's range—that allowed for the "ongoing management of most forests on State, County, and private lands for harvest on a short-rotation schedule" and "the destruction of the older forest habitats favored by red tree voles."

FWS_23493, FWS_23505–23513, 23518–23519. Even on lands managed by the State, the Service found "no mechanisms in place to protect existing occupied tree vole sites outside of [designated] retention areas." FWS_23513. The Service "therefore concluded existing regulatory mechanisms on State land are inadequate to provide for the conservation of the [tree vole], as they contribute to threats of habitat destruction, modification, or curtailment[,]" as well as "habitat fragmentation and isolation of small populations[.]" FWS-23513.

Because of these inadequate protective regulatory mechanisms, the 2016 assessment found that there was "no evidence to suggest the present dearth of suitable habitat for the [tree vole] will be alleviated by the modest projected increases in older forest conditions on Federal and State lands" and that regardless of any gains, habitat would remain fragmented "due to the management practices on intervening private lands that inhibit connectivity." FWS_23500. The Service found that even a "potential gain of 20 percent more suitable habitat … is likely not sufficient to offset the loss, modification, and fragmentation of habitat and isolation of populations that collectively pose an immediate threat to the [tree vole]." FWS_23500.

The 2016 assessment concludes that Federal lands alone could not alleviate the threats to the tree vole because "Federal lands make up less than a quarter of the area of the DPS" and "suitable red tree vole habitat will remain restricted in size, in distribution, and in a fragmented, isolated condition for the foreseeable future." FWS_23502. In particular, federal lands north of Highway 20 were found to be "insufficient to support stable populations" because of the "combination of small amounts of Federal land, limited connectivity between these lands, and few known vole sites[.]" FWS_23516. Thus, habitat fragmentation on isolated Federal land north of Highway 20 is a threat, as it "restricts red tree vole distribution and magnifies the effect of

habitat loss occurring from [random] events, further limiting the [tree vole's] ability to persist in an area or recolonize new sites." FWS_23516.

The 2016 assessment further noted that climate change and wildfire threaten the tree vole, because "[f]orests in the Pacific Northwest face an increased risk of large-scale fires within the foreseeable future," with climate change anticipated to result "in an extended period of high fire risk and large increase in area burned[,]" and "estimated increases in forest areas burned over the next century rang[ing] from 180 to 300 percent." FWS_23524–23525.

According to the 2016 assessment, the threat posed by wildfires is potentially existential, "[c]onsidering that the majority of the remaining tree vole habitat … is limited to Federal land" and "restricted to two separate clusters[,]" making it "certainly possible to lose much of the Federal land in either of these blocks to a single stand-replacement fire, further limiting habitat and restricting the range of the tree vole[.]" FWS_23525.

Indeed, the Service specifically noted that past fires in the Coast Range burned areas "twice as large as either of the remaining clusters of Federal land[,]" and that this was prior to the current predicted increases in fire magnitude related to climate change. FWS_23526. Ultimately, the 2016 assessment concluded it is "reasonably likely that a single stand-replacing fire could occur within the foreseeable future that would eliminate much of the remaining suitable habitat for tree voles[.]" FWS_23526.

Given these threats, the 2016 assessment determined that the tree vole was in danger of extinction now or in the foreseeable future "[b]ecause of the existing habitat conditions, the limited ability of the red tree vole to persist in much of the DPS, and its vulnerability in the foreseeable future until habitat conditions improve[.]" FWS_23537.

### III.    The 2019 Species Status Assessment

In 2019, the Service abruptly reversed course and issued a not-warranted finding for the tree vole. FWS_00011–00016. Prior to this reversal, the Service conducted a "species status assessment" ("SSA"), which was intended to provide "the biological support for the decision on whether or not to propose to list the DPS as threatened or endangered[,]" but not any determination of whether the tree vole should be listed. FWS_06680.

The SSA reiterated most of the findings underlying the Service's prior warranted findings, and acknowledged the tree vole "has lost viability over the past 100 years due to the loss of habitat that has not been restored or regrown, combined with an associated decline or extirpation of voles in these areas[,]" primarily due to timber harvest and wildfire. FWS_06771. The Service again recognized that this habitat loss and resulting fragmentation left isolated populations "vulnerable to the effects of isolation and fragmentation due to their small home ranges and limited dispersal capabilities." FWS_06722. Ultimately, the Service concluded that habitat fragmentation may be a more significant threat than habitat loss, as isolated populations could lead to "inbreeding depression, reduced fitness, [genetic] bottlenecks, deleterious mutations, and genetic drift." FWS_06723, FWS_06725. The Service also acknowledged that timber harvest, in conjunction with wildfire compounded by climate change, would continue to restrict the tree vole's range and threaten its viability. FWS_06771.

The SSA identified eleven "habitat clusters" possibly large enough to support tree vole populations and assessed their resiliency under four scenarios. FWS_06673–06674. Of these eleven habitat clusters, only two—the "Nestucca Block" and the "South Block," which contain higher concentrations of federal lands—were deemed viable. FWS_06673–74, 06759–06762. However, as in past findings, the SSA recognized that wildfire could result in "loss of either or both of these habitat clusters," FWS_06674, with the Nestucca Block "small enough that it could

be completely consumed by a single fire event typical of historic wildfires." FWS_06744. Moreover, the SSA recognized that the risk of wildfire within the tree vole's range is increasing with climate change, as "[i]t is expected that weather conditions conducive to producing past large-scale wildfires will increase with predicted climate change[.]" FWS_06674.

Of the nine other habitat clusters, the SSA concluded four "will become extirpated over time," FWS_06674, and one has a "low overall resiliency score at 60 years," is isolated from other clusters, and faces ongoing threats. FWS_06770. The remaining four clusters, outside of the Nestucca Block and South Block, "may" maintain an "overall moderate resiliency score," but are "at risk for loss of genetic diversity [and] the evolutionary capacity to adapt to changing environments," which, when compounded with the effects of climate change, puts "these moderate clusters at more risk to extirpation." FWS_06770. Overall, the SSA concluded that the nine clusters "are substantially smaller in area and population size, isolated from neighboring clusters, and are less resilient to stochastic events," particularly wildfire. FWS_06743.

### IV.    The Challenged Agency Action: The Service's Not-Warranted Finding

On December 19, 2019, the Service determined that the tree vole does not warrant listing as endangered or threatened. FWS–00001–00007. The Service's not-warranted finding, as well as the "species assessment and listing priority assignment form" ("2019 assessment") that supported this finding, acknowledged the serious threats posed by habitat loss and fragmentation, inadequate regulatory mechanisms, and wildfire, and the precarious status of most remaining tree vole population clusters, but reversed its seven previous warranted-but-precluded determinations to the contrary anyway. This reversal primarily relies on the Service's finding that the tree vole would persist on the federal lands in the Nestucca Block and South Block. *See* FWS_00014.

## STANDARD OF REVIEW

The Administrative Procedure Act ("APA") provides the standard of review in lawsuits challenging the Service's ESA listing decisions. *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1023 (9th Cir. 2011). Under the APA's standard, a court must hold unlawful and set aside "agency actions found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.* (quoting 5 U.S.C. § 706(2)(A)). Agency action are "arbitrary and capricious" if:

> . . . the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

This Court's review is "a substantial inquiry," requiring "a thorough, probing, in-depth review." *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005) (cleaned up). Even when the Service acts within its area of competence, a court "need not defer to the agency when the agency's decision is without substantial basis in fact, and there must be a rational connection between the facts found and the determinations made." *Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1163 (9th Cir. 2009).

Further, if a "new policy rests upon factual findings that contradict those which underlay its prior policy, the agency must provide a reasoned explanation for disregarding facts and circumstances that underlay or were engendered by the prior policy." *CBD v. Haaland*, 998 F.3d at 1067 (cleaned up). "This framework applies to a change in position on whether a species warrants protection under the ESA." *Id.*

## ARGUMENT

The Service's not-warranted finding is arbitrary and capricious, and failed to follow the best available science, because it (1) failed to provide a reasoned explanation for its about-face from the agency's prior conclusions that the tree vole warranted listing, (2) improperly dismissed the threat of wildfire, and (3) failed to analyze or recognize the threats and risk of extinction the tree vole faces in a significant portion of its range. Instead, the Service found that the tree vole did not warrant listing as an endangered or threatened species because it would continue to persist on the federal lands in the Nestucca Block and South Block, FWS_00066, and because "there is no geographical concentration of threats so the threats to the species are essentially uniform throughout its range." FWS_00067. Neither of these justifications are supported by the facts or the law.

### I.    The Conservation Groups Have Article III Standing to Challenge the Not-Warranted Finding

To satisfy Article III's standing requirements, a plaintiff must demonstrate that (1) it is injured, (2) the injury is fairly traceable to the challenged action, and (3) a court order could redress that injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Since the Conservation Groups are suing on behalf of their members, they must satisfy three additional prerequisites: "(1) their members must otherwise have had standing to sue on their own behalf; (2) the interests at stake must be germane to the organizations' purposes; and (3) neither the claim asserted nor the relief requested must require the participation of individual members in the lawsuit." *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1171 (9th Cir. 2002).[1]

---

[1] Only one of the plaintiffs needs to have standing to satisfy Article III's case-or-controversy requirement. See *Massachusetts v. Envtl. Prot. Agency*, 549 U.S. 497, 518 (2007) ("Only one of the petitioners needs to have standing to permit us to consider the petition for review.")

The Conservation Groups have standing to bring this action because their members' professional and personal interests in looking for and observing the tree vole in its old-growth forest habitat are harmed by the Service's failure to provide the tree vole with the ESA's protections and conservation benefits. *See generally* Decl. of David Greenwald; Decl. of Doug Heiken; Decl. of Robert Sallinger; Decl. of Reed Wilson; Decl. of Nicholas Cady; *see also Lujan*, 504 U.S. at 562–63 ("[T]he desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing."). An order from this Court vacating the not-warranted finding and ordering the Service to reconsider listing the tree vole would redress those injuries. *See Badgley*, 309 F.3d at 1171–73 (finding plaintiff organizations had standing to sue on behalf of their members over the Service's failure to comply with the requirements of section 4 of the ESA for several species).

The Conservation Groups members therefore "have standing to sue in their own right." The interests at stake are also germane to the Conservation Groups' purposes of protecting imperiled species and their habitats, including the tree vole, *see* Greenwald Decl. ¶¶ 2–3; Heiken Decl. ¶¶ 2, 7, 10; Sallinger Decl. ¶¶ 3–7, 12; Cady Decl. ¶¶ 2–9, and "neither the claim asserted nor the relief requested requires the individual members' participation in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env'tl Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). The Conservation Groups thus have standing to sue on behalf of their members.

## II.    The Service Failed to Explain Its About-Face Determination That the Tree Vole No Longer Warranted Endangered Species Act Protection

From 2011 to 2019, on seven separate occasions, the Service found that the tree vole warrants listing under the ESA. FWS_24051–24093; FWS_23911–23978; FWS_23782–23841; FWS_23662–23710; FWS_23559–23590; FWS_23438–23464; FWS_23364–23389. On December 19, 2019, the Service reversed course and found that the tree vole no longer warrants

listing. FWS_00011–00016. But the same factors that led to the Service's prior findings that the tree vole warranted the ESA's protection are still present today, and the Service's not-warranted finding, the 2019 assessment, and the SSA do not provide a reasonable explanation for their reversal. This failure renders the not-warranted finding arbitrary and capricious because when an agency changes its position, it cannot discard prior findings without a reasoned explanation. *Fed. Commc'n Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009) ("*FCC v. Fox*"); *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1067–68 (9th Cir. 2018) ("*CBD v. Zinke*") (applying this edict to an agency's change in position on whether a species warrants protection under the ESA).

The Ninth Circuit recently rejected the Service's failure to provide a reasonable explanation for its change in position in *Center for Biological Diversity v. Haaland,* where the Center for Biological Diversity challenged the Service's reversal of its prior determination that the Pacific walrus warranted listing under the ESA. 998 F.3d at 1063. In that case, the Service had previously concluded the Pacific walrus warranted listing due to the loss of sea-ice habitat, subsistence hunting, and the lack of adequate existing regulatory mechanisms. *Id.* at 1064–65.

Similar to the tree vole, the Service had found that while listing was warranted, it was precluded by other more urgent listing actions. *Id.* at 1065. On review, the Ninth Circuit found the Service had failed to "offer more than a cursory explanation of why the findings underlying its [early warranted finding] no longer apply," *id.* at 1068, and that the species status assessment underlying the not-warranted finding "did not offer a comparison between its findings and those in the 2011 decision, only mentioning the 2011 process on limited occasions, and indicated uncertainty in several critical conclusions." *Id.* at 1065. Ultimately, the Ninth Circuit determined that "although the [a]ssessment contain[ed] some new information, the actual decision document

does not explain why this new information resulted in an about-face from the Service's 2011 conclusion that the Pacific walrus met the statutory criteria for listing." *Id.* at 1069. As a result, the Service's not-warranted finding for the Pacific walrus was arbitrary because the Service had failed to provide a reasoned explanation for "disregarding facts and circumstances that underlay … the prior policy." *Id.* at 1068.

The Service's not-warranted finding for the tree vole suffers from the same flaws, and similarly fails to meaningfully address its prior warranted findings. For example, several threats informed the Service's prior findings that the tree vole warranted listing, including the threat of wildfire. FWS_23523–23526. Specifically, the Service found in its 2016 assessment that it was "reasonably likely" that "a single stand-replacing wildfire could occur within the foreseeable future" that "would eliminate much of the remaining suitable habitat for tree voles within the DPS." FWS_23526. Indeed, the Service determined that the threat of wildfire was increasing due to climate change, which was anticipated to result "in an extended period of high fire risk and large increases in area burned[,]" FWS_23524, with "estimated increases in forest areas burned over the next century rang[ing] from 180 to 300 percent." FWS_23525.

In the not-warranted finding, however, the Service dismisses the threat of wildfire with a newly minted rationale that "the episodic nature of Coast Range fires makes the probability of a large-scale, severe wildfire difficult to predict." FWS_00047, FWS_00064–00066. This rationale—uncertainty about *when* wildfire might occur—cannot provide a reasoned explanation because the Service had previously acknowledged such uncertainty, and "[s]imply reiterating generic uncertainty that was known at the time of the prior finding does not meet the agency's burden to explain its change in position." *CBD v. Haaland*, 998 F.3d at 1070; FWS_23532 (finding in the 2016 assessment that "[a]lthough large-scale disturbance events such as fire are

not common … climate change projections indicate a likely increase in both fire risk and fire size[,]" and thus wildfire and other threats "pose a significant threat" to the tree vole).

The Service's rationale also fails to provide a reasoned explanation for its sudden change in position because, as the Service continues to recognize, this lack of predictability does not change the fact that a large stand-replacing wildfire "remains the stressor with the greatest future implications" for the tree vole. FWS_00065; *see also* FWS_00057 (noting that the size of the South Block and Nestucca Block would "allow them to withstand or recover from most disturbance events *except for* unpredictable large, catastrophic wildfires") (emphasis added); FWS_00060 (finding that current habitat can be maintained in the DPS "barring large-scale catastrophic disturbances" such as wildfire). The Service's "failure to offer more than a cursory explanation" of why wildfire no longer threatens the tree vole renders the not-warranted finding arbitrary and capricious. *CBD v. Haaland*, 998 F.3d at 1068; *see also CBD v. Zinke*, 900 F.3d at 1070 (finding that the Service failed to provide "any additional evidence or scientific studies" explaining its change in position from its prior finding that the artic grayling was threatened by warm water temperatures).

The Service also failed to provide a reasoned explanation for why it no longer found that "existing regulatory mechanisms on State land" fail "to provide for the conservation of the [tree vole], as they contribute to threats of habitat destruction, modification, or curtailment[,]" as well as "habitat fragmentation and isolation of small populations." FWS_23513. Nor did the Service provide any information to refute its prior conclusion that the limited incidental protections afforded to the tree vole on state lands were "not expected to provide for long-term persistence of red tree vole populations given their isolated nature and the allowance for removal of some [protections] if the target species is no longer present." FWS_23518.

To the extent that the Service provides any reasons for its change in position, it points to new studies that allegedly show that 26 percent of the tree vole's range constitutes habitat, as opposed to the previously believed 11 percent, resulting in two blocks of habitat primarily on federal lands—the "South Block" and the "Nestucca Block"—in which the species will allegedly persist. FWS_00064–00066. But this fact alone cannot justify the Service's change in position, because the Service had previously found that these habitat blocks, even including potential increases in known habitat, were insufficient to ensure the tree vole's continued survival, due to the threat of wildfires exacerbated by climate change, ongoing loss and fragmentation of habitat, population isolation, and inadequate regulatory mechanisms on state and private lands, which make up the vast majority of the tree vole's range. *See supra* at 7–10; FWS_23500 ("[E]ven a "potential gain of 20 percent more suitable habitat … is likely not sufficient to offset the loss, modification, and fragmentation of habitat and isolation of populations that collectively pose an immediate threat to the [tree vole]."); FWS_23526 (finding it "reasonably likely that a single stand-replacing fire could occur within the foreseeable future that would eliminate much of the remaining suitable habitat for [the] tree vole"); FWS_23493 (finding that current regulatory mechanisms on private and state lands allowed for timber harvest on a short-rotation schedule resulting in "the destruction of the older forest habitats favored by [tree voles]").

The Service's failure to provide a "reasoned explanation" for why these prior findings do not hold true today renders the not-warranted finding arbitrary and capricious.

III.    **The Service Failed to Follow the Best Available Science When the Service Improperly Dismissed the Threat of Wildfire Due to Alleged Uncertainty**

The threat of "a large-scale, stand-replacing wildfire consistent with historic fire regimes in the Coast Range remains the stressor with the greatest future implications" for the tree vole. FWS_00065. The Service's not-warranted finding, however, dismisses this existential threat

because the agency cannot predict with certainty when and where it would occur. FWS_00064–65. But it is "not enough for [the Service] to simply invoke 'scientific uncertainty' to justify its action." *CBD v. Zinke*, 900 F.3d at 1072. The Service "must explain why uncertainty justifies its conclusion[.]" *id.*, because the ESA requires the Service to make listing decisions on "the best scientific data available," not the "the best scientific data possible." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014) (cleaned up).

The Ninth Circuit recently rejected a similar attempt by the Service to rely on uncertainty when issuing another not-warranted finding in *Center for Biological Diversity v. Zinke*, 900 F.3d at 1058. There, the Service disregarded the additive effect climate change was having on threats facing the arctic grayling (low stream flows and high-water temperatures) by pointing to scientific uncertainty about how future precipitation and temperature scenarios would affect water availability. *Id.* at 1072. The Ninth Circuit held that the Service acted arbitrarily when it failed "to explain why the uncertainty of climate change favors not listing the arctic grayling as opposed to taking another course of action[,]" such as listing. *Id.* at 1073. The Ninth Circuit found that listing the grayling "may have been particularly prudent given the ESA's policy of 'institutionalized caution[.]'" *Id.* (quoting *Ariz. Cattle Growers'*, 606 F.3d at 1167).

Here, the Service has repeatedly acknowledged that the best available science shows that wildfire is a grave threat to the tree vole's continued persistence and that it could wipe out any of the remaining tree vole habitat blocks, including the South Block or Nestucca Block—the two blocks of habitat the Service relied upon for its not-warranted finding. FWS_00057 (finding that while these two blocks would otherwise be able to "withstand or recover from most disturbance events," they are still vulnerable to "unpredictable large, catastrophic wildfires"). Even when issuing the not-warranted finding, the Service continued to recognize that while it could not

predict exactly when wildfire might strike the tree vole, it "expect[ed] wildfire to occur *at some point* in time[,]" FWS_00055 (emphasis added); that "[i]ncreased droughts projected with climate change will likely *increase the probability* of wildfire [sic] within the foreseeable future," FWS_00065 (emphasis added); and that the farther out into the future the agency looked, the *more likely* it was that the tree vole's remaining populations would be threatened by wildfire. FWS_00055. In essence, the Service admits that it is not a question of *if* the tree vole will be affected by wildfire, but *when*, and that climate change is increasing the likelihood of catastrophic wildfire within the tree vole's range.

In the face of these facts, the Service's mere recitation of uncertainty fails to explain why uncertainty councils in favor of not listing rather than listing the tree vole. The Service's reliance on uncertainty to justify its not-warranted finding is even more unavailing given that the agency acknowledged such uncertainty in its numerous prior warranted findings and still found that the threat of wildfire merited in favor of listing. *See* FWS_23525–23526 (acknowledging uncertainty surrounding wildfire but concluding that "it is reasonably likely that a single stand-replacing fire could occur within the foreseeable future that would eliminate much of the remaining suitable habitat for tree voles within the DPS"); *see CBD v. Haaland*, 998 F.3d at 1070. ("Simply reiterating generic uncertainty that was known at the time of the prior finding does not meet the agency's burden to explain its change in position)."

Without a reasonable explanation of why uncertainty counsels in favor of dismissing the threat of wildfire, the not-warranted finding is arbitrary and capricious, and the Service essentially asks this Court to "defer[] to a coin flip." *Greater Yellowstone Coal.*, 665 F.3d at 1028 (finding that uncertainty regarding the impact the decline of an important food source would have on grizzly bears could not justify the Service's decision to remove ESA protections).

Uncertainty does not prevent the Service from listing the tree vole because "the Service need not wait until a species' habitat is destroyed to determine that habitat loss may facilitate extinction." *Alaska Oil & Gas Ass'n*, 840 F.3d at 683; *id.* at 680 ("The ESA does not require [the agency] to make listing decisions only if underlying research is ironclad and absolute.") Indeed, listing the tree vole "may have been particularly prudent given the ESA's policy of 'institutionalized caution[.]'" *CBD v. Zinke*, 900 F.3d at 1073.

### IV.    The Service Failed to Adequately Consider Whether the Tree Vole is Threatened or Endangered in a Significant Portion of Its Range

When issuing it's not-warranted finding, the Service failed to consider whether the tree vole is endangered or threatened (i.e., at risk of extinction or at risk of becoming so in the foreseeable future) in a significant portion of its range. Instead of looking at the tree vole's actual status, the Service asked a different question not contemplated by the statute—whether the tree vole faces a concentration of threats in a portion of its range. FWS_00066–00067. This analysis sidesteps the ESA's fundamental requirement to determine if a species is at risk of extinction in a significant portion of its range. *See* 16 U.S.C. §§ 1533(a)(1), 1532(6), 1532(20).

Regardless, when looking at whether the tree vole faces a concentration of threats, the Service engaged in a cursory analysis and determined, without support in or reference to the record, that there are no areas within the tree vole's range where threats are "geographically concentrated … at a biologically meaningful scale." FWS_00067. The Service's perfunctory conclusion is entirely unsupported by the record, which demonstrates that many of the threats the tree vole faces—such as habitat loss and fragmentation from logging, inadequate regulatory mechanisms, and small and isolated populations—are, in fact, concentrated on private and state lands, and within nine out of eleven habitat clusters where the tree vole is facing imminent threats to its survival, especially within four clusters predicted to be lost under all scenarios.

In doing so, the Service runs afoul of Ninth Circuit precedent requiring it to "at least explain [its] conclusion that the area in which the species can no longer live is not a 'significant portion of its range.'" *Defs. of Wildlife v. Norton*, 258 F.3d at 1145–46. Lacking a "substantial basis in fact," and failing to make "a rational connection between the facts found and the determinations made[,]" the Service's not-warranted finding is arbitrary and capricious and contrary to law. *Ariz. Cattle Growers'*, 606 F.3d at 1163.

> **A. The Service's Failure to Analyze Whether the Tree Vole is in Fact Endangered or Threatened in a Significant Portion of Its Range Violates the Endangered Species Act**

The ESA requires the Service to determine whether a species is endangered or threatened "throughout … a significant portion of its range." 16 U.S.C. §§ 1533(a)(1); 1532(6) (defining "endangered species"); 1532(20) (defining "threatened species"). But rather than simply ask whether the tree vole is endangered or threatened in a significant portion of its range, the Service instead asked, "whether the threats are concentrated in any portion of the species' range at a biologically meaningful scale." FWS_00067. This impermissibly sidesteps the ESA's requirement to determine a species' status in a significant portion of its range, i.e., to ask "Is this species, in fact, endangered or threatened in a significant portion of its range?"

An example is illustrative. Hypothetically, a threat could be evenly concentrated over a species' entire range. Under the Service's framework, this would be the end of the "significant portion of its range" inquiry. But, due to the underlying status of certain populations, they may be at greater risk of extirpation because of that same threat. For instance, the likelihood of wildfire striking any given tree vole population may be more or less equal. But the impact of wildfire on any given population may differ and may leave certain populations in danger of extirpation from a single wildfire event. The Service admits as much when it notes that the size of the Nestucca Block and the South Block protect them from extirpation from all but the largest

wildfires, while "the remaining nine clusters in the analysis area are substantially smaller in area and population size, isolated from neighboring clusters, and are less resilient to stochastic events." FWS_06743. Thus, "[t]he scale of catastrophic events in the coast range such as wildfire cause us to heavily weigh the largest clusters in their contribution to redundancy of red tree vole clusters in [the tree vole's range]." FWS_06743.

Thus, even though the threat may not be concentrated, it can still tip the scales and place species at risk of extinction in significant portions. The Service's current approach, however, never looks at this. Consequently, the Service "entirely failed to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43—whether the species is in fact endangered or threatened in a significant portion of its range—and violated the ESA.

## B. The Tree Vole Is in Danger of Extinction, Now and in the Foreseeable Future, in a Significant Portion of its Range

In addition to being legally flawed, the Service's "significant portion of its range" analysis is not supported by the record, which clearly demonstrates that the tree vole is in danger of extinction, now or in the foreseeable future, in the significant portion of the tree vole's range on private and state lands, and in nine out of eleven remaining habitat clusters. Private and state lands respectively make up 70.4 percent and 12.2 percent of the tree vole's range, FWS_00040, and, as the Service has recognized, "[l]and ownership [has] had the greatest influence on changes in forest structure during the 20th century[,]" with the Service noting that "[t]he historic losses of old forest and ongoing management of most non-Federal forests on a short-rotation [timber harvest] schedule have resulted in the destruction of the older forest habitats favored by [the tree vole]," leaving "older forest habitats … in isolated fragments across the [tree vole's range]." FWS_06719. Recurring harvest on short rotations also ensures that these areas will not become or remain suitable habitat. FWS_06720.

The high rate of timber harvest on non-Federal lands occurs in large part because tree voles receive little protection on state lands and almost no protection on private lands. FWS_06726 (recognizing in the SSA that "there are currently no State regulations protecting red tree voles or their habitat."); FWS_06728 (recognizing that "there is little regulatory protection for red tree voles under the Oregon Forest Practices Act[,]" which governs timber harvest on private lands in Oregon). As a result, "tree vole habitat … has changed from being the dominant forest type in the early 1900s to a fragmented network of smaller patches scattered through a matrix of predominantly young forest." FWS_06723. This "has reduced high-quality habitat for tree voles to relatively isolated patches." FWS_06722.

Tree voles are particularly susceptible to the "effects of isolation and fragmentation due to their small home ranges and limited dispersal capabilities." FWS_06722. These "isolated populations are more likely to decline than those that are not isolated," and "[s]mall, isolated populations place" the tree vole "at great risk of local extirpation or extinction due to a variety of factors, including loss of genetic variability, inbreeding depression, demographic stochasticity, environmental stochasticity, and natural catastrophes." FWS_06724.[2] When conducting their analysis of whether threats are concentrated, the Service overlooked these threats.

The effects of habitat loss and fragmentation from timber harvest, and the lack of adequately protective regulatory mechanisms, are apparent in the Service's projections for the eleven remaining tree vole habitat clusters. Only the two largest clusters comprised primarily of federal lands have "high" overall condition scores. FWS_00057; *see also id.* ("[A]lmost all of the

---

[2] "Stochastic events that put small populations at risk of extinction include, but are not limited to the following: variation in birth and death rates, fluctuations in gender ratio, inbreeding depression, and random environmental disturbances such as wildfire, wind, and climatic shifts." FWS_06724.

Federal ownership in the analysis area is encompassed in these two clusters, except for scattered or isolated patches of BLM checkerboard ownership."); FWS_06737 (showing the SSA's analysis of the current condition of each cluster). The "nine remaining habitat clusters are substantially smaller," and several of them are isolated from the other clusters by distances "far surpassing tree vole dispersal distances." FWS_00057–00058. These clusters "are all considered to be highly affected by habitat loss and fragmentation, given that they encompass a small area with limited capacity to support tree voles. FWS_06728.

The Service found that four of these clusters are "marginally secure," but are "at some risk for loss of genetic diversity and the evolutionary capacity to adapt to changing environments." FWS_00060–61. Another cluster was found to have sufficient habitat, but it is "far removed from any adjacent clusters[,]" leaving it "generally insecure." FWS_00060–61. The Service predicted that "the four smallest clusters will become extirpated within [the foreseeable future] because they remain vulnerable to inbreeding." FWS_00061; FWS_06761–62. The Service did not predict that any of these nine clusters would grow, because of ongoing timber harvest and because there is "little prospect for developing red tree vole habitat under existing forest management regulations and practices." FWS_00061.

Despite these facts, the Service did not consider whether state and private lands, or the nine clusters where it admits the species' survival is tenuous, constitute a significant portion of the species' range where it is endangered or threatened. This runs directly counter to the plain language of the statute which requires the Service to look at the species' actual status. It also ignores substantial record evidence demonstrating the tree vole does, in fact, face a concentration of threats in a significant portion of its range. The Service's failure is contrary to the statute and

fails to "state a rational connection between the facts found and the decision made." *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1065 (9th Cir. 2004).

### C. The Service Failed to Explain Why the Tree Vole Is Not Endangered or Threatened in a Significant Portion of Its Range

The Service's cursory "significant portion of its range" finding also failed to provide any explanation for why the threatened parts of the tree vole's range are not significant, which is in violation of Ninth Circuit precedent. As the Ninth Circuit has found, the ESA requires the Service to "explain [its] conclusion that the area in which the species can no longer live is not a 'significant portion of its range.'" *Defs. of Wildlife v. Norton*, 258 F.3d at 1145; *Tucson Herpetological Soc'y v. Salazar*, 566 F.3d 870, 877 (9th Cir. 2009) (holding the Service is required to give "some rational explanation for why . . . portions of a species' range are insignificant"). "A satisfactory explanation of agency action is essential for adequate judicial review, because the focus of judicial review is not on the wisdom of the agency's decision, but on whether the process employed by the agency to reach its decision took into consideration all the relevant factors." *Defs. of Wildlife v. Norton*, 258 F.3d at 1145 (cleaned up).

As outlined above, the Service has recognized that "[s]tate and private lands, which comprise the majority" of the tree vole's range, "provide little suitable habitat for tree voles." FWS_23495. What habitat remains "persist[s] largely in small, isolated fragments[,]" which cannot "support viable populations of … tree voles over the long term." FWS_23493. In the face of these facts, the Service concluded, without any meaningful explanation or citation to the record, that the tree vole is not endangered or threatened in a significant portion of its range because it faces "no concentration of threats in any portion of [its range] at a biologically meaningful scale." FWS_00067. The Ninth Circuit has rejected such cursory explanations as legally insufficient.

In *Defenders of Wildlife v. Norton*, plaintiff environmental groups challenged the Service's withdrawal of the proposed rule to list the flat-tailed horned lizard as a threatened species. 258 F.3d at 1137–1140. The Service had not made an explicit finding regarding the lizard's status in a significant portion of its range, but the argument boiled down to plaintiffs' argument that listing was warranted due to threats on *private* land, and the Service's contention that the lizard was not threatened in a significant portion of its range because the lizard would continue to survive on *public* land. *Id.* at 1140–44. The Ninth Circuit rejected the Service's failure to "at least explain [its] conclusion that the area in which the species can no longer live is not a 'significant portion of its range[,]'" when it was "apparent that the area in which the lizard is expected to survive is much smaller than its historical range." *Id.* at 1145–46. In doing so, the Court made significant note of the Service's failure to consider that "habitat on private land may constitute 'a significant portion of its range' demanding enhanced protections not required on public lands," that the lizard may face unique threats in a significant portion of its range, or that the benefits of regulatory measures meant to protect the lizard may not protect it equally or sufficiently throughout a significant portion of its range. *Id.* The Ninth Circuit therefore found the Service's withdrawal of the proposed rule arbitrary and capricious and remanded it to the Service to address the deficiencies in its "significant portion of range" analysis. *Id.* at 1146–47.

After the Service again denied protection for the lizard, the Ninth Circuit was forced to consider the Service's "significant portion of its range" analysis for the lizard a second time in *Tucson Herpetological Soc'y*, 566 F.3d 870. In its second go, the Service again concluded that "the lost portions of the lizard's range [were] not geographically, biologically, or otherwise significant." *Id.* at 876–77. On review, the Ninth Circuit found that the Service's "stated reasons all rely, to varying degrees, on the premise that lizard populations persist throughout most of the

species' remaining range." *Id.* at 877. But the Ninth Circuit held that it "is insufficient, under *Defenders*, to point to one area or class of areas where lizard populations persist to support a finding that threats to the species elsewhere are not significant; the ESA requires a more thorough explanation." *Id.* The court thus found that the record failed to "lead to the conclusion that the lizard persists in a substantial portion of its range[,]" and that the Service's significant portion of its range analysis lacked a substantial basis in fact. *Id.* at 878–879.

In relying on the tree vole's alleged persistence in the South Block and Nestucca Block, and ignoring the substantial portion of the tree vole's range on private land, the Service runs squarely into the Ninth Circuit's requirement in *Defenders of Wildlife v. Norton* that the Service consider whether habitat on "private land may constitute 'a significant portion of its range' demanding enhanced protections not required on public lands," 258 F.3d at 1145–46, and the Ninth Circuit's admonition in *Tucson Herpetological Soc'y* that the Service may not "point to one area … where … populations persist to support a finding that threats to the species elsewhere are not significant." 566 F.3d at 877. As a result, the Service's cursory "significant portion of its range" analysis is arbitrary and capricious because it failed to "explain [the Service's] conclusion that the area in which the species can no longer live is not a 'significant portion of its range.'" *Defs. of Wildlife v. Norton*, 258 F.3d at 1145. "[T]he ESA requires a more thorough explanation." *Tucson Herpetological Soc'y*, 566 F.3d at 877.

## REMEDY

If this Court finds in favor of the Conservation Groups, they ask this Court to vacate and remand the Service's not-warranted finding and to order the Service to issue a new 12-month finding for the tree vole within one year of this Court's order. Vacatur and remand of the not-warranted finding is the presumptive remedy if it is arbitrary and capricious. 5 U.S.C. §

706(2)(A); *see also Fed. Election Comm'n v. Akins*, 524 U.S. 11, 25 (1998). ("If a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action and remand the case.").

Such an order would be within this Court's authority to grant, as Congress explicitly granted district courts the authority "to order the Secretary to perform such act or duty … under section 4 which is not discretionary with the Secretary." 16 U.S.C. § 1540(g)(1)(C). The order would also be consistent with similar past orders setting deadlines for action on remanded ESA decisions. *See, e.g.*, *Tucson Herpetological Soc'y*, 566 F.3d at 874 (noting a district court order requiring the Service to reinstate a proposed listing rule within sixty days and to issue a final decision within twelve months); *Trout Unlimited v. Lohn*, 645 F. Supp. 2d 929, 965 (D. Or. 2007) (remanding decision to withdraw proposed listing rule and ordering agency to issue a new final listing rule within sixty days).

The order would also accord with Congress' intent when it imposed strict deadlines on completing listing determinations so that imperiled species would receive life-saving protections in a timely fashion. These deadlines require the Service to conclude the listing process within two years when starting with a blank slate. *See* 16 U.S.C. § 1533(b)(3)(A)–(B), (b)(6)(A). Here, having recently completed the SSA and given its numerous prior warranted findings, the Service will hardly be starting from a blank slate. Twelve months should give the agency enough time to issue a new finding given that the tree vole has already waited over fourteen years.

## CONCLUSION

For the foregoing reasons, the Conservation Groups ask this Court to vacate and remand the Service's not-warranted finding, and to order the Service to issue a new 12-month finding for the tree vole within one year of this Court's order.

Dated this 29th day of October, 2021.    Respectfully submitted,


*/s/ Ryan Shannon*
RYAN SHANNON (OSB # 155537)
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211-0374
Phone: 503-283-5474 ext. 407
Email: rshannon@biologicaldiversity.org

BRIAN SEGEE (Cal. Bar No. 200795)
Center for Biological Diversity
660 S. Figueroa Street, Suite 1000
Los Angeles, CA 90017
Phone: (805) 750-8852
Email: bsegee@biologicaldiversity.org
Pro Hac Vice

*Attorneys for Plaintiff*